# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7037 | **DATE** | 10/23/2002 |
| **CASE TITLE** | EEOC et al vs. Outsourcing Solutions et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION:** Defendants' motion (Doc 22-1) for summary judgment is granted in part and denied in part. Defendants' motion for summary judgment on Plaintiff's claims of retaliation and constructive discharge is granted in part and denied in part. Plaintiffs may go forward only with their claim that Defendants retaliated against Shimanski when they passed her up for promotion in February 2000. Defendants' motion for summary judgment as to Intervenor-Plaintiff Malone's Conspiracy claims is granted. All other pending motions are moot. Parties are given to December 13, 2002 to file a Joint Final Pretrial Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | OCT 2 4 2002 | |
| | Notified counsel by telephone. | | | date docketed | 48 |
| ✓ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| | SCT | courtroom deputy's initials | | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | |
| KATRINA MALONE, | ) ) | |
| Plaintiff-Intervenor, | ) ) | |
| vs. | ) ) | 01 C 7037 |
| OUTSOURCING SOLUTIONS INCORPORATED and OSI COLLECTION SERVICES, INC., | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

CHARLES P. KOCORAS, Chief District Judge:

Before the court are two motions for summary judgment. Both motions are brought by Defendants, Outsourcing Solutions, Inc. and OSI Collection Services, Inc. (hereinafter referred to collectively as "Defendants" or "OSI"). Defendants move for summary judgment on the Title VII retaliation claims of three putative class member Plaintiffs represented by the EEOC, Katrina Malone ("Malone"), Kimberly Shimanski ("Shimanski"), and John Sheehan ("Sheehan") and the constructive discharge claims

of Malone and Sheehan. Defendants also move for summary judgment on Plaintiff-Intervenor Malone's conspiracy claims. For the reasons set forth below, the motion related to Plaintiff's Title VII claims is granted in part and denied in part, and the motion concerning Intervenor-Plaintiff Malone's conspiracy claims is granted.

## BACKGROUND

Between both sides there have been over four hundred factual paragraphs filed with the court. We have presented only a brief synopsis of the undisputed facts here to provide the reader with some context for our discussion of the case. Defendant Outsourcing Solutions, Inc. ("OSI") is an accounts receivable management company. Defendant OSI Collection Services, Inc. ("OSICS") is a wholly-owned subsidiary of OSI Support Services, Inc., which is a wholly-owned subsidiary of OSI. OSICS offices are located in Schaumburg, Illinois. OSICS is engaged in the business of third party debt collection. During the times relevant to this lawsuit, the Schaumburg facility worked collections in the telecommunications industry and in the healthcare industry.

The hierarchy of authority at the Schaumburg facility, from highest ranking to lowest, is as follows: (1) the facility's manager who is referred to as the Production or Operations Manager; (2) Collection Manager; (3) Supervisors; (4) Assistant Supervisors, formerly referred to as Unit Leaders; (5) Account Representatives, also referred to as "Account Reps" or "Collectors." Account Representatives and Assistant

Supervisors are compensated with a base salary as well as commission. The majority of employees at the Schaumburg facility are Account Representatives. Account Representatives are assigned to work on various groups of accounts. The accounts are grouped by age of the account and/or client type or location. Assignments change constantly, as OSICS continually evaluates the most efficient means of collecting revenue.

Revenue collection is accomplished in two ways. One way is by contacting debtors via manual telephone dialing. The other is telephone contact by use of a dialer. The dialer is an automated dialing system which continually processes and runs through various phone numbers that have been entered into its database and automatically dials only numbers which are still valid. Once a connection is made, the dialer sends the call to the next collector who has indicated he can accept a call. The efficiency of the dialer is increased as the number of collectors working on the dialer increases because there are more individuals available to accept calls as a connection is made. At all times relevant to this lawsuit, the Schaumburg facility maintained a "dialer station" which allowed a maximum of ten Collectors to work on the dialer at any one time. Beginning October 2000, the Schaumburg office implemented a "virtual dialer system," which allows each and every collector to access the dialer system at his or her own desk.

Shimanski, Malone, and Sheehan are all former employees of Defendants. Shimanski began her employment with Defendants as an Account Representative at the Schaumburg facility on July 27, 1995. Shimanski terminated her employment by tendering her letter of resignation on November 2, 2000.

Malone began her employment with Defendants as an Account Representative at the Schaumburg facility on November 4, 1996. She was promoted to Unit Leader in 1998. On October 11, 2000, Malone began a voluntary medical leave of absence. She remained on leave until November 27, 2000 when she verbally tendered her resignation of employment. She later confirmed her resignation with a written letter of resignation dated November 30, 2000.

Sheehan's ties to Defendants began in March 1999 when he was hired as a Supervisor at Missouri Medical Collections, another wholly-owned subsidiary of OSI. Dennis Decker ("Decker") was his manager at that location. Sheehan tendered a letter of resignation to Decker on September 20, 1999, but withdrew it after Decker agreed to better communicate management decisions. He tendered a second letter of resignation effective March 31, 2000. Responding to Sheehan's desire to have more management experience, Decker asked Daniel Picciano ("Picciano") if there were any openings for supervisory positions for Sheehan within OSI but outside of the Missouri Medical Collections operation. These efforts subsequently led to Sheehan's

employment as a Supervisor at the Schaumburg facility. Prior to beginning his employment there, Sheehan had numerous conversations with Judy Krueger ("Krueger"), who was the Production Manager of the Schaumburg facility, and James Benjamin ("Benjamin"), Vice President of OSI Healthcare Services. Sheehan began working at the Schaumburg facility on April 17, 2000. When he first began working there, both Shimanski and Malone were assigned to his team. Sheehan submitted a letter of resignation on June 14, 2000 and a second such letter on June 26, 2000. In his last letter, he expressed an interest in other opportunities with OSI.

In January 1999, two Account Representatives working at the Schaumburg facility, Annamarie Quela ("Quela") and Shelby Mignault ("Mignault"), made internal complaints of sexual harassment against certain of their coworkers and one of their supervisors, George Chaharbakhshi (hereinafter referred to interchangeably as "Char" or "Chaharbakhshi"). Quela and Mignault complained to Krueger and to Don Colasuono ("Colasuono"), who was the Collection Manager at the facility. OSICS initiated an investigation of Quela and Mignault's complaints. The investigation was led by Krueger and Colasuono. Statements were obtained from about twenty employees.

On February 8, 1999, Quela and Mignault filed charges of discrimination with the EEOC, alleging they had been subjected to a sexually hostile work environment in

violation of Title VII. They sued in federal court on March 23, 1999. Between January 1999 and June 1999, Quela and Mignault made additional internal complaints of employee misconduct which prompted further investigation. In connection with these further investigations, Krueger and Colasuono collected about seventy more written statements. In July 1999, Quela and Mignault amended their complaint to add claims of retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and Title I of the Civil Rights Act of 1991 and to add two plaintiffs.

Shimanski and Malone were both interviewed in connection with these investigations. Shimanski provided a written statement on January 21, 1999. Shimanski prepared the statement on her own and then gave it to Colasuono who, in turn, gave it to Krueger. Shimanski's statement was not favorable to OSI.

Malone provided a total of six written statements. Malone also provided deposition testimony for the Quela litigation on January 18, 2000. Some time in March 2000, Malone contacted the plaintiffs' attorney in the Quela litigation and subsequently provided an affidavit where she states she was coerced into providing false deposition testimony and false witness statements.

Judge Castillo held an evidentiary hearing to address the concerns raised by Malone's affidavit. During the hearing, Judge Castillo sustained Malone's attorney's Fifth Amendment objections to OSI's inquiries concerning the basis of her assertions

of coercion on ten separate occasions. Among his many other findings of fact and law, Judge Castillo found that Krueger and Char had pressured Malone into providing false statements and witness testimony. Judge Castillo issued a default judgment order against defendants on all claims brought by all four plaintiffs in that case.

Upon receiving notice of the order during the week of May 22, 2000, the head of Defendants' Human Resources Department, Pete Pugal ("Pugal"), notified Krueger's manager, Benjamin, and Benjamin's manager, Picciano, Group President of OSI Healthcare. On June 2, 2000, the company convened a meeting at a hotel near the Schaumburg office. In attendance were Pugal; Krueger; Benjamin; Picciano; and OSI's attorney in the Quela litigation. During the meeting, it was decided that Krueger would take a leave of absence for between sixty to ninety days. Defendants contend the purpose behind this decision was to prevent retaliation against Malone, but the EEOC disputes this. Because the Schaumburg office was not performing strongly, Picciano asked Marla Lumpkins ("Lumpkins"), who was not working at that facility at the time, to manage the facility during Krueger's absence. Lumpkins was to review operations and make recommendations for improvement.

Krueger had been gone for a week when Lumpkins arrived at Schaumburg. Cathy Kozial ("Kozial") had been acting as lead manager. The Supervisors at that time were Sheehan; Harut Mekjian ("Mekjian"), Jennifer Lipper ("Lipper"), and Sharon

Sheppard ("Sheppard"). All except Sheppard reported to Lumpkins. The Unit Leaders at the time were Altof Khan ("Khan"), Fred Thomas ("Thomas"), Malone, Shimanski, Neil Bartel ("Bartel"), Craig Montgomery ("Montgomery"), Tom Sklena ("Sklena"), and Sandy Grady ("Grady").

Upon her arrival, Lumpkins began making observations and questioning the employees about operations. She discovered that many had no knowledge of how their commissions were determined. Some employees told her they made "deals" with Krueger in which they were guaranteed certain compensation regardless of their performance. Lumpkins ultimately concluded there was inconsistency in the base salary, compensation, and commissions of many Account Representatives, Unit Leaders, and Supervisors. Lumpkins also determined that many Supervisors lacked management skills and had no idea how their Unit Leaders or Account Representatives were compensated or what the duties of their Unit Leaders were. She further learned that the Unit Leaders themselves did not have a clear understanding of what their duties were and how their commissions were calculated. Lumpkins also discovered that Skills Development Training ("SDR") was rarely done at the facility. SDR was a training program for Collectors. Additionally, Lumpkins discovered that the use of the dialer was minimal at the Schaumburg facility. Further, Lumpkins could not discern the methods Krueger used to make promotion decisions.

Beginning on August 1, 2000, Lumpkins implemented office-wide changes at the facility. She eliminated the Unit Leader position and replaced it with the Assistant Supervisor position. The title and job responsibilities of all former Unit Leaders changed accordingly, but the move was a lateral one. In August 2000, Lumpkins met with all the new Assistant Supervisors, including Malone, Shimanski, and Sklena, to explain their new role. Lumpkins also overhauled the compensation plan throughout the Schaumburg facility. Her goals were to create parity, to allow for greater compensation for Supervisors with broader responsibility, and to tie employees' commissions to overall performance. Lumpkins and Benjamin reviewed the changes to ensure that each employee would be able to earn as much as before, if not more, so long as they were productive and performing their job. Between June 12, 2000 and November 30, 2000, about thirty employees from the Schaumburg facility either resigned or were terminated.

Krueger passed away on September 26, 2000. She had been on leave continuously up until that time. Krueger had worked at the Schaumburg facility for over thirty-five years. On or about October 1, 2000, Lumpkins officially assumed the senior management position at the Schaumburg facility with the title of Operations Manager.

Malone filed a charge of discrimination with the EEOC on October 3, 2000. She alleged an individual claim of retaliation. On May 31, 2001, the EEOC issued a reasonable cause determination for Malone's charge. The EEOC did not notify Defendants of its investigation of alleged mistreatment toward Sheehan, Shimanski or any other employee. The EEOC filed the instant lawsuit on September 11, 2001, alleging Defendants discriminated against a class of employees in violation of Title VII. No employees other than Malone were identified in the complaint. The EEOC now alleges that Defendants retaliated against Malone, Shimanski, and Sheehan. Malone subsequently sought leave to intervene in the lawsuit. Malone's motion to intervene was granted on October 17, 2001. Malone brings two claims based on conspiracy theories. One is brought under 42 U.S.C. § 1985(2), the Ku Klux Klan Act, and the other is a claim of civil conspiracy brought under Illinois law.

## LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of

material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant." Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994). When reviewing the record, the court must draw all reasonable inferences in favor of the non-movant; however, the court is "not required to draw every conceivable inference from the record – only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991). With these legal principles in mind, the court turns to the merits of Defendants' motion.

## DISCUSSION

As a preliminary matter, this Court must address the requirements under Local Rule 56.1. Local Rule 56.1 sets forth guidelines for litigants moving for and opposing

summary judgment. Under this rule, the party moving for summary judgment must file, among other things, a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." Loc. R. 56.1(a)(3). The required statement must consist of short numbered paragraphs, and within each paragraph there must be specific cites to the record that support those facts. Id. Further, Local Rule 56.1(b) requires that a party opposing a motion for summary judgment must file, among other things: [A] concise response to the movant's statement that shall contain: (A) a response to each numbered paragraph in the moving party's statement, including in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (B) a statement consisting of short numbered paragraphs of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials. Loc. R. 56.1(b)(3). Any facts that are not specifically denied will be deemed admitted in considering a motion for summary judgment. Id.; see also Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524, 527-28 (7th Cir. 2000).

Neither parties' submissions follow the letter or the spirit of these rules. None of the submissions are concise. Oftentimes paragraphs are employed rather than sentences. Both parties have filed more documents than permitted by the rules without

seeking leave of court. Instead of filing one summary judgment brief within fifteen pages, Defendants have filed two separate motions. Defendants have also, without seeking or obtaining leave, filed a paper not called for by the rules: a Reply to Plaintiffs' Joint Response to Defendants Statement of Facts. Plaintiffs similarly filed more paper than permitted under the local rules without seeking this court's leave. In responding to Defendants' motion for summary judgment, Plaintiffs filed a joint response consisting of almost thirty pages. In addition, Plaintiffs' joint submission of additional facts, although permitted by the rules, is unnecessarily long for it repeats many of the facts in Defendants' Statement of Facts. Indeed, Plaintiffs often repeat themselves throughout their statements of facts. Moreover, both parties often fail to properly respond to each other's facts. Many of their responses improperly consist of argument or additional facts.

Plaintiffs filed a motion to strike certain of Defendants' submissions in whole or in part. Upon hearing the parties on that motion to strike in open court, this court expressed its disappointment with the parties' submissions. We offered the parties the choice of withdrawing their submissions and resubmitting streamlined submissions or standing on their papers and risking the imposition of sanctions if we deemed their submissions unnecessarily lengthy and burdensome upon the court. Plaintiffs declined to streamline their submissions. Defendants opted to streamline their Response to

Plaintiffs' Joint Statement of Additional Facts. Of course, this effort did not make a significant change given that Plaintiffs did not amend their Statement of Additional Facts.

In deciding the instant motion, we have not considered Defendants' Reply to Plaintiffs' Joint Response to Defendants' Statement of Facts or Defendants' Reply Appendix, as such papers are not permitted by the local rules and Defendants did not seek leave to file them. We have deemed admitted those facts improperly denied. The parties are also informed that the court has excluded evidence it has determined to be hearsay or otherwise inadmissible. We do not explain per paragraph what has been stricken because, given the great number of paragraphs filed in connection with these motions, such a task would be too burdensome on the court and not in the interests of judicial economy, interests which the parties have ignored.

## I.    Claims of Retaliation under Title VII:

The EEOC alleges that Shimanski, Sheehan, and Malone are victims of retaliation by OSI. Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under the statute. 42 U.S.C. § 2000e-3(a). A Title VII claim of retaliation can be established by either direct or

indirect evidence of the employer's retaliatory intent. Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002). Because more often than not there is no direct evidence of a retaliatory intent, most plaintiffs attempt to prove their claims through the indirect method of proof. Hilt-Dyson, 282 F.3d at 465.

Under the indirect method of proof, a plaintiff must make out a prima facie case that her employer retaliated against her. Id. To make out her prima facie case, the plaintiff must prove: "(1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." Id.; Stone v. City of Indianapolis Pub. Utils. Div., No., 01-3210, 2002 WL 234239, at *1 (7th Cir. Feb. 19, 2002). Failure to satisfy any element of the prima facie case proves fatal to a plaintiff's retaliation claim. Id. If the employee succeeds in proving her prima facie case, the employer must offer a legitimate, non-invidious reason for the adverse employment action. Id.; Stone, 2002 WL 234239, at *3. Once the employer does so, the burden shifts back to the plaintiff to show that the reason advanced by the employer is pretextual. Stone, 2002 WL 234239, at *3. If the plaintiff cannot show pretext, her

retaliation claim fails. Having set forth the applicable methods of proof, we now assess the parties' arguments and the evidence as to each of these three individuals.

## A. Shimanski:

Shimanski alleges OSI retaliated against her because of the written statement she provided during Defendants' internal investigation of the sexual harassment complaints at the center of the Quela litigation. According to the EEOC, one form of this alleged retaliation occurred when Defendants passed up Shimanski for a promotion in February 2000. The EEOC argues that the record contains direct evidence of OSI's intent to retaliate against Shimanski in this regard. The evidence at issue consists of a statement Krueger allegedly made to Kozial who then conveyed it to Shimanski. According to Shimanski, sometime in 2000, Kozial told her that Krueger had told Kozial that Krueger was not allowed to promote anyone who is involved in the lawsuit. (Shimanski Dep. 116-120).

Before addressing whether this statement constitutes direct evidence, we address Defendants' contention that this statement is inadmissible hearsay. In support of their argument, Defendants assert that Krueger's statement to Kozial was conveying an instruction to Krueger by an unidentified declarant at OSI and, therefore, inadmissible. We are not persuaded by Defendants' position. We find the statement more akin to a statement of OSI's policy or attitude and that it was made within the scope of

employment at all levels. See Hybert v. Hearst Corp., 900 F.2d 1050, 1053 (7th Cir. 1990). It is undisputed that Krueger and Kozial were agents of OSI at the time. It is also undisputed that Krueger was a decision maker with regard to employee promotions at the Schaumburg office. Additionally, it is evident from the record that Krueger's "higher-ups", Krueger, and Kozial all had roles and influenced personnel decisions relating to the Schaumburg office. Further, both Krueger and Kozial had supervisory positions over Shimanski. We thus conclude that each level of hearsay falls within Rule 801(d)(2)(D) of the Federal Rules of Evidence.

We note that in the case relied upon by Defendants, Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1002 (3rd Cir. 1988), the court expressed concern that, due to the presence of an unidentified declarant, it could not determined whether the statement at issue there was one made by an agent within that agent's scope of employment. Based on the evidence in the record, we are not presented with a like dilemma. Therefore, we find the statement admissible.

We now turn to the question of whether this statement constitutes direct evidence of OSI's intent to retaliate against Shimanski for her written statement in the Quela investigation. Direct evidence is defined as an acknowledgment of discriminatory intent by defendant or defendant's agents. Home Repair, Inc. v. Paul W. Davis Sys., Inc., 2000 WL 126905, at *5 (N.D. Ill. Feb. 1, 2000). Direct evidence

is a "smoking gun," id., that will, if believed by the fact-finder, prove the particular fact in question without reliance on inference or presumption." Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999). If the evidence consists of isolated statements, those statements must be "causally related to the . . . decision making process . . . because direct evidence relates to the motivation of the decision maker responsible for the contested decision." Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999) (citations omitted). Such evidence "in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion." Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997).

Applying these principles here, we find that the statement is not direct evidence of OSI's retaliatory intent against Shimanski. Although the statement is clearly connected to the relevant decision makers in this case, the statement is ambiguous as to whom it applies. From the statement we learn that Krueger could not promote anyone "involved in" the lawsuit, yet the meaning of "involved in" is left open to interpretation. Two employees were promoted who provided statements in the internal investigation of the Quela complaints. They could be considered "involved in" that litigation. The statement requires an additional inference to determine whether or not "involved in" included Shimanski. The statement does not specifically mention

Shimanski, and this militates against a finding that it constitutes direct evidence. See e.g., Teymer v. Kraft Foods North America, Inc., 37 Fed. Appx. 206, 212 (7th Cir. 2002).

We also find it significant that the statement came at least two months after Mekjian and Sheppard were promoted. Markel v. Bd. of Regents of Univ. of Wisconsin Sys., 276 F.3d 906, 910 (7th Cir. 2002) (statements made two months prior to adverse action not contemporaneous as required by case law and therefore not direct evidence of discrimination). Thus, we cannot conclude that the statement at issue constitutes direct evidence of OSI's intent to retaliate against Shimanski by failing to promote her. However, the statement may support an inference of discrimination under the indirect method of proof, particularly on the issue of whether the Defendant employer's proffered reason for the action is pretextual. Ozturk v. Motorola, Inc., 1998 WL 182515, at *6 (N.D. Ill. April 16, 1998). We now address whether Shimanski has met her burden of proof under the indirect method of proof.

Defendants argue that the EEOC cannot establish the third and fourth elements of the prima facie case with regard to Shimanski.[1] The EEOC claims that, in addition

---

[1] In a footnote, Defendants argue that Shimanski did not engage in a protected activity and, therefore, does not meet the first element of a Title VII prima facie claim of retaliation. We find that, because she assisted OSI in its internal investigation of the sexual harassment complaints forming the basis of the Quela litigation, Shimanski was engaged in an activity protected by 42 U.S.C. § 2000e-3(a).

(continued...)

to OSI's failure to promote Shimanski in February 2000, there were numerous other adverse employment actions visited upon Shimanski by OSI, such as: assigning Shimanski to accounts that were not collectable; holding assistant supervisor meetings without Shimanski; depriving Shimanski of tools for doing her job, such as removing Shimanski's responsibilities as client liaison, as well as her ability to write letters and approve checks, and limiting her computer access; spending less time on SDR training for Shimanski; and suspending and demoting Shimanski for making an inappropriate comment on the collection floor.

We next address whether the EEOC has met its burden on the third and fourth elements of a Title VII claim of retaliation with regard to each of these actions in turn. Before doing so, we set forth the applicable legal standards. We first note that, while the Seventh Circuit defines adverse employment actions quite broadly, the adverse action at issue must still be adverse. Drake v. Minn. Mining & Manufacturing Co., 134 F.3d 878, 885 (7th Cir. 1998). A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of

---

[1](...continued)
We also note that, although Defendants initially argued in their opening brief that the EEOC did not have sufficient proof that Shimanski was meeting OSI's legitimate expectations, they have abandoned this argument. In their reply, Defendants identify the elements in dispute as: (1) employment actions about which plaintiffs complain are not materially adverse; and/or (2) similarly situated employees who did not engage in protected activity were treated the same. (Def.'s Reply at 2-3).

job responsibilities. Crady v. Liberty Nat'l Bank and Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993). Whether an employment action is materially adverse may be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, a loss in benefits, or other indices that might be unique to a particular situation. Id.; Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir. 1994).

As to the fourth element, the EEOC must show that Shimanski was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Stone, 2002 WL 234239, at *1. Employees are similarly situated when there is a "substantial similarity" between their positions, such as a common supervisor and similar standards governing their performance. Radue v. Kimberly-Clark Corp., 219 F.3d 612, 7617-18 (7th Cir. 2000).

With regard to the EEOC's assertion that OSI unlawfully passed up Shimanski for a promotion in February 2000, it is well-established that failure to promote is an adverse employment action. Stutler v. Ill. Dept. of Corrections, 263 F.3d 698, 703 (7th Cir. 2001). Additionally, making all reasonable inferences in favor of the EEOC, as we must for the purposes of this motion, we find there is a genuine issue as to whether Shimanski was treated worse than similarly situated employees who did not engage in protected activity.

There is evidence in the record from which a fact finder could reasonably conclude that Shimanski was just as qualified for the position as Mekjian and Sheppard. Defendants have failed to dispute this point and, in fact, fail to show that Shimanski was not qualified for the position or any less qualified than Mekjian and Sheppard. Furthermore, Mekjian, Sheppard and Shimanski all shared the same position at OSI at the time. Defendants attempt to argue that the EEOC does not meet this element because Mekjian and Sheppard, like Shimanski, provided statements in connection with the Quela investigation. Defendants' argument misses the mark. While Mekjian and Sheppard each provided statements in the internal investigation, their statements, unlike Shimanski's, were not detrimental to Defendants. Mekjian's statement placed the Quela plaintiffs in an unfavorable light and Sheppard's statement was neutral. Accordingly, we find that the EEOC has made out a prima facie case with regard to OSI's failure to promote Shimanski. Therefore, we find that Shimanski's claim with regard to this action survives summary judgment.

We do not, however, come to the same conclusion about the remaining actions at issue. Before addressing each specifically, we note that the EEOC does not specifically point out in its brief if Lumpkins, who arrived at Schaumburg nearly a year and half after Shimanski made her statement, had any knowledge of the nature of

Shimanski's statement. This presents an obstacle to the EEOC insofar as the EEOC seeks to prove that Defendants retaliated against Shimanski through Lumpkins.

Turning to the specific allegations at hand, we find that the EEOC has not met its burden on either element with regard to the claims of insufficient SDR training. Shimanski herself testified that she was not interested in SDR training. (Shimanski Dep. 151). Additionally, the EEOC admits that Shimanski attended a three day class by Sheehan on the principles of SDR. Although the EEOC contends SDR training was to be once per month, the evidence cited for this conclusion does not support it. Indeed, the evidence in the record reveals that the amount of SDR the employees at Schaumburg received was based on their superiors' assessment of how much the employees needed to improve their skills. There is no evidence supporting a conclusion that Shimanski needed SDR training more than any of the employees she claims received more of such training than her. Therefore, we find that the alleged lack of training does not amount to an adverse employment action with regard to Shimanski. Ajayi v. Aramark Business Services, Inc., 2002 U.S. Dist. LEXIS 9824, at *18 (N.D. Ill. May 30, 2002).

Moreover, the only evidence in the record supporting the fourth element is Shimanski's own speculation that other Unit Leaders received more training, which in turn is based on her assessment that the other employees complained about attending

SDR more than she did. We find that this evidence does not create a genuine issue for trial.

Nor has the EEOC shown that Shimanski's alleged exclusion from certain meetings constitutes an adverse employment action. The EEOC provides no evidence documenting any such meetings. Nor does the EEOC explain or present evidence indicating how or why being excluded from them would adversely affect the terms and conditions of Shimanski's employment. Furthermore, Shimanski testified that she did attend the meetings for which there is documentation in the record. These were meetings held while Lumpkins was managing the Schaumburg facility for the purpose of informing Assistant Supervisors about their new positions. Thus, to the extent that the EEOC attempts to bring a claim on behalf of Shimanski related to her exclusion from certain meetings, this attempt fails.

The EEOC's argument that Shimanski was deprived of the tools necessary to accomplish her job and that this constitutes a material adverse employment action similarly fails. Although Shimanski testified that not being allowed to access 411, to send letters out, to validate checks, and to perform certain functions on the computer all limited her ability to collect money, there is no evidence in the record that her pay decreased or her benefits were otherwise affected. The record evidences that Lumpkins restricted all of these duties as part of her office-wide changes. Additionally, there is

evidence indicating that employees could access an internal directory that contained client contact information and that this internal directory was less expensive for OSI than permitting employees to call 411. We further note that Shimanski herself testified that she cannot recall what functions she was prevented from doing on the computer system. Moreover, Shimanski testified that she did not know if other Unit Leaders had these duties taken from them the same time.

Next, the EEOC argues that Shimanski was subjected to an adverse employment action when she was no longer permitted to act as a client liaison for out of state clients. This conclusion is not supported by the record. Contrary to the EEOC's position, "client liaison" was not a designated duty for those with Shimanski's position. She had only some limited experience with contacting out of state clients personally. There was no specific client liaison position before Lumpkins' arrival. Lumpkins created the position because she concluded it would be better for OSI's clients if there was an OSI employee on site to assist with them. (Lumpkins Dep. 351). Thus, the creation of this position was part of the greater, office-wide changes Lumpkins implemented. Indeed, the EEOC admits Lumpkins removed client contact from all Assistant Supervisors, not just Shimanski. (Pl.'s Resp. to Def.'s Facts ¶ 91).

The EEOC next claims that Shimanski's assignment to old accounts[2] amounts to an adverse employment action because it was more difficult to collect on such accounts. There is no dispute that older accounts are generally more difficult to collect. (Def.'s Resp. to Pl.'s Add. Facts ¶ 90). There does appear to be a dispute as to whether these accounts were financially worth collecting – the implication being that being assigned to such accounts made it more difficult for an employee to earn commission. While Sheehan testified that these accounts were so old it was counterproductive to have Shimanski and Malone work on them, Kozial testified that these accounts were not less desirable because they could still generate revenue for OSI. We find this dispute irrelevant with regard to Shimanski, however, because the EEOC has failed to direct this court to any evidence indicating that Shimanski's pay actually decreased as a result of working these older accounts. See e.g., Hardy v. Univ. of Ill., Chicago, 2002 U.S. Dist. LEXIS 8047, at *25 (N.D. Ill. May 6, 2002).

Finally, we address the discipline imposed upon Shimanski in September 2000. Shimanski was both suspended and demoted for inappropriate conduct. As a result, she was no longer eligible to receive bonuses associated with performing the duties of an Assistant Supervisor. Defendant's admit that, as a consequence, Shimanski's

---

[2] The parties both sometimes refer to this as the "special project" to which Malone and Shimanski were assigned.

commissions in September 2000 were significantly lower than in previous months. (Def.'s Resp. to Pl.'s Add. Facts ¶ 253). We note that because commissions in this case are like bonuses, restricting them likely is not an adverse action. See Miller v. American Family Mutual Ins. Co., 203 F.3d 997, 1006 (7th Cir.2000) (holding denial of a bonus was not such an action within the meaning of Title VII); Rabinovitz v. Pena, 89 F.3d 482, 488-89 (7th Cir.1996). We conclude that the EEOC has not met its burden on the fourth element. They have not presented evidence of any employee in Shimanski's position engaging in like conduct who was not disciplined. To the contrary, when Mekjian spoke inappropriately he was initially given a written warning and, when he spoke inappropriately a second time, he was terminated.

Even if the EEOC had made out a prima facie case as to this incident, Defendants have met their burden of producing a legitimate reason for the conduct. Lumpkins described Shimanski's conduct as "inconceivable" and stated it referred to sexual activity and was unprofessional. Defendants also explain that Shimanski's conduct was considered even more inappropriate given her supervisory role. Additionally, Shimanski admits that she made a wholly inappropriate remark, testified that she understood why Lumpkins had to suspend her, and concedes that Lumpkins handled the matter professionally. Given the record, Defendants' chosen discipline is not suspect. Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000).

Accordingly, we find that the EEOC can proceed on behalf of Shimanski with regard to its claim that Krueger unlawfully failed to promote Shimanski in February 2000, but Defendants' summary judgment motion is granted as to all other claims relating to Shimanski.

**B.    Malone:**

Many of the arguments Defendants lodge against the sufficiency of the EEOC's case as it relates to Malone mirror those lodged with regard to Shimanski. And for many of the same reasons that Defendants' arguments succeed as to Shimanski's claims, they succeed as to Malone.

Malone complains about many of the same things as Shimanski: lack of SDR training; the taking away of certain duties related to the Unit Leader position; being excluded from meetings; and being assigned to the "special project." As with Shimanski, the EEOC fails to meet its prima facie burden as to any of these alleged unlawful actions. The evidence does not create a genuine issue of material fact that any of these actions amount to materially adverse employment actions. Nor has the EEOC shown that similarly situated employees who did not engage in any protected activity were treated differently as to create a triable issue of fact.

In addition, the record indicates that many of the changes Malone complains about were changes Lumpkins implemented as part of her office-wide restructuring to

correct what appears to have been numerous management problems at the Schaumburg facility. Malone's frustration with so many changes at once, while perhaps understandable, is not enough to support a finding that these actions were material adverse actions affecting the terms and conditions of her employment. These changes were part of the lateral move from the position of Unit Leader to Assistant Supervisor and lateral moves without a showing of loss of benefits does not constitute an adverse employment action. Stutler v. Ill. Dept. of Corrections, 263 F.3d 698, 702 (7th Cir. 2001); Adams v. Triton College, 2002 U.S. App. LEXIS 8622, at *10-11 (7th Cir. Apr. 29, 2002).

The EEOC's case as it relates to Malone does differ in some respects. First, the EEOC claims, unlike with Shimanski, that Malone's ability to make money was diminished as a result of these actions. A reduction in pay would militate in favor of finding an adverse employment action. Hilt-Dyson, 282 F.3d at 466. In support of its argument, the EEOC asserts that the average amount of Malone's paychecks decreased after she recanted her testimony in March 2000. At first blush, this argument appears persuasive. Closer examination of the evidence, however, dismantles the EEOC's position. In its calculations, the EEOC includes Malone's paycheck that covers some days during which she was on leave in October 2000. It follows that she did not work as many days during those pay periods as she did the others. Excluding this pay

period, Malone's average paycheck is actually higher than the average paycheck for the three months prior to her March 28, 2000 revelation. Thus, it cannot be concluded that Malone suffered a loss in pay. This militates against a conclusion that she suffered any materially adverse employment actions. McKay v. Town & Country Cadillac, Inc., 2002 U.S. Dist. LEXIS 7724, at *59 (N.D. Ill. Apr. 23, 2002).

Another way in which Malone's claim differs from Shimanski's is that Malone complains about being the only Unit Leader on the dialer and about being assigned to the dialer for excessive amounts of time. The EEOC's argument relating to dialer time does not provide a basis for Malone's claim of retaliation. First, as explained above, despite allegedly being on the dialer more, Malone did not experience a pay reduction. Second, the EEOC has not shown that Malone was on the dialer more than other similarly situated employees who did not engage in a protected activity. On the contrary, Sheehan testified that he wanted all the Unit Leaders on his team, which included Malone, on the dialer more because he thought it was a good collection tool and because he wanted the Unit Leaders to lead by example. Additionally, part of the office-wide changes Lumpkins implemented included increasing all employee's time on the dialer and making the dialer a better collection tool by adjusting it in a number of ways to permit employees to accumulate new business. Lumpkins testified that, after these adjustments were made, many employees began to like working on the

dialer. Malone disputes that Lumpkins standardized dialer time at the Schaumburg facility, but the parties' dispute on this issue does not change the result because, as explained, the record does not support a finding that this was an adverse employment action.

The EEOC also contends that OSI engaged in excessive monitoring of Malone and that this constitutes an adverse employment action. None of the evidence proffered by the EEOC supports this conclusion. The EEOC asserts that Malone felt like she was being watched all the time, but her subjective feelings are not proof of OSI's retaliatory intent. The EEOC claims that Malone's desk was moved often and, at one point, placed near Krueger's desk. Yet Malone could not pinpoint the exact locations or timing of these moves. Malone claims that her phone calls were monitored more often. The EEOC makes much of the fact that Sheehan complained to Krueger about Malone on a regular basis, but Malone was never disciplined in connection with these complaints. Malone also testified that Lumpkins would not communicate with her, but the record establishes otherwise. Finally, Malone complains about Lumpkins looking over her shoulder and taking numerous notes on her. The record evidences, however, that Lumpkins took detailed notes about all the goings on at the Schaumburg facility. None of this evidence raises a genuine issue of fact for trial as to whether this monitoring stemmed from a retaliatory intent on the part of OSI. See e.g., Teymer, 37

Fed. Appx. at 212 (stating courts want to stay out of the business of second guessing the degree to which an employee should be supervised).

Next, the EEOC asserts that in May 2000, Kozial presented Sheehan with a report indicating that Malone's performance was less than adequate and that she had to be "written up." When Sheehan saw the report, he agreed with Kozial that Malone should be "written up." After confronting Malone with the report, she protested that it was inaccurate. Sheehan reran the report and discovered that it in fact was inaccurate; Mekjian had not run all of Malone's time when he ran the report. Although the EEOC argues this indicates a retaliatory intent on the part of OSI, we remain unpersuaded. Sheehan took this issue to Krueger who, upon reviewing the report and seeing that it was inaccurate, became upset, ripped it up, and agreed that Malone should not be disciplined. Accordingly, this incident did not result in any action that materially and adversely affected the terms and conditions of Malone's employment.

Therefore, Defendants' motion for summary judgment is granted as to Malone's retaliation claim.

### C. Sheehan:

The crux of the Sheehan's claim is that OSI retaliated against him for refusing to assist OSI in retaliating against Malone. Defendants argue that the EEOC cannot establish the first and third elements of a Title VII retaliation claim as to Sheehan. We

do not address Defendants' arguments as to the first element, because we find that the EEOC has not met its burden with respect to the third.

The EEOC asserts that the following actions experienced by Sheehan constitute adverse employment actions: insufficient dialer time for his team; he did not receive his expense checks in a timely fashion; he had difficulty arranging his move when he submitted bids to the corporate office; and OSI did not promote him to Krueger's position despite promises of such a promotion.

The record does not support a determination that Sheehan suffered a material and adverse change in the terms and conditions of his employment because of any of these actions. Drake v. Minn. Mining & Mftg. Co., 134 F.3d 878, 886 (7th Cir. 1998). He ultimately received his expense reimbursement and his misdirected paycheck. In addition, although the EEOC attempts to connect Sheehan's problems with the bids relating to his move to Benjamin, the record evidences that Benjamin was not familiar with the specifics of the department in charge of moves and that some changes in the procedure for submitting bids had been made. Furthermore, Sheehan testified that his income was not reduced at all during his employment at the Schaumburg facility. Hill v. Am. Gen'l Fin., Inc., 218 F.3d 639, 645 (7th Cir. 2000). None of these has been shown to be an adverse employment action.

Although the EEOC claims Sheehan was promised numerous times that he would be given Krueger's position in a short period of time, the record does not bear this out. According to Sheehan's own testimony, both the individuals that discussed his employment at Schaumburg with him only stated that a leadership opportunity would be available there eventually. The evidence in the record is not at all specific as to what type of leadership opportunity would become available or when such an opportunity would become available. Nor is there any evidence that Sheehan applied for this coveted position. In fact, he resigned before Krueger's death. Therefore, we find that none of the evidence proffered as support of this claim creates a triable issue.

The EEOC also contends that OSI had Sheehan monitored by a subordinate, Shimanski, and that this evidences OSI's intent to retaliate against Sheehan. This contention is based on Sheehan's testimony that Shimanski told him that Kozial asked her to watch Sheehan. The evidence does not, however, link this instruction to any retaliatory intent on the part of OSI management. Rather, the evidence shows that Kozial asked Shimanski to monitor Sheehan because she saw Sheehan as competition for Krueger's position and wanted to note any negative aspects of his performance.

Accordingly, we grant Defendants' motion for summary judgment as to Plaintiff's claim that OSI retaliated against Sheehan.

## II.     Malone and Sheehan's Claims of Constructive Discharge.

Malone and Sheehan claim that they were constructively discharged.   An employee may assert a claim of constructive discharge "when she is forced to resign because her working conditions from the standpoint of a reasonable employee, have become unbearable." Mosher v. Dollar Tree Stores, Inc., 240 F.3d 662, 667 (7th Cir. 2001).   "Unbearable" means the working conditions must be more than merely unbearable in an unbearable or intolerable way, "they must be intolerable in a discriminatory way." Rabinovitz v. Pena, 89 F.3d 482, 489 (7th Cir. 1996).   An employee may not be unreasonably sensitive to his working environment. Rabinovitz, 89 F.3d at 489.   Some circumstances in which the Seventh Circuit has found conditions satisfying this standard include: a series of escalating sexual remarks culminating in physical assault and a death threat; a manager held a gun to his subordinate's temple; and where a subordinate's sexual relationship with her supervisor led to a suicide attempt. Simpson v. Borg-Warner Automotive, Inc., 196 F.3d 873, 877 (7th Cir. 1999) (collecting cases).

Applying these legal principles to the facts in the record, we conclude that the evidence does not support that Sheehan or Malone experienced intolerable working conditions.   As explained above, the EEOC has not met its burden of showing that the

employment actions they experienced constituted materially adverse employment actions.

As to Sheehan, the evidence shows he was unreasonably sensitive to his work environment. Sheehan submitted a total of four resignation letters in a period spanning only fifteen months. Indeed, the two letters submitted while he was at the Schaumburg facility were submitted within two weeks of each other. Furthermore, Sheehan appears to have been motivated to resign because of his own belief that Lumpkins would be permanently replacing Krueger and he would not have a chance to take over her position. There is no evidence in the record to support this conclusion other than his own speculation. Finally, Sheehan expressed in his final letter or resignation a desire to continue working with the company. It would be unreasonable to conclude that an employee who has worked at two different facilities within the same corporate structure would desire to continue employment within that corporate structure if the employee had experienced unbearable working conditions during his employment and was unhappy at both facilities.

In addition, although an employee is not required to file a lawsuit before resigning to preserve his claim, failure to object to egregious conditions or to seek some form of redress is compelling evidence that the employee, or any reasonable worker, would not find the conditions intolerable. Mosher, 240, F.3d at 667. An

employee may not be unreasonably sensitive to his work environment and, "[a]bsent extraordinary conditions, a complaining employee is expected to remain on the job while seeking redress." Id. At this stage of the litigation, Plaintiff is required to present evidence that quitting was the only way Malone and Sheehan could extricate themselves from the conditions they now allege were intolerable. Gawley v. Ind. Univ., 276 F.3d 301, 315 (7th Cir. 2001).

Malone claims she complained twice in August 2000 in the form of written notes addressed to Lumpkins. These notes do not reflect any alleged retaliation by Krueger. Additionally, these notes are more fairly read to constitute complaints about all the changes Lumpkins was making generally and not about retaliation. This is especially so given they were written in August 2000, the month during which Lumpkins was implementing all the changes.

Even if we characterize Malone's notes to Lumpkins as complaints about retaliation, Malone's claim fails because Malone failed to follow Defendants' policy on reporting alleged retaliation. The policy in effect during this time directs all employees who have complaints to report them to their department managers or their superiors. If the employee is not satisfied with the manager's response, the employee is to appeal the response to Pugal, the head of Human Resources. If the employee remains unsatisfied, the employee is directed to appeal to the President and CEO of the

company. (Def.' Facts ¶ 28). The EEOC admits that Malone received a copy of this policy, but there is no evidence that Malone complained about retaliation to Pugal or any other OSI manager.

Similarly, there is no evidence that Sheehan made any formal complaints of retaliation to his managers as required by the company policy. Even if we considered his resignation letters as constituting a complaint of retaliation for these purposes, Sheehan cannot be said to have waited for corrective action. Grube v. Lau Indus. Inc., 257 F.3d 723, 728, (7th Cir. 2001) (instructing that employees who quit without giving their employer a reasonable chance to resolve a problem have not been constructively discharged). His second letter came right on the heels of his first. Moreover, Sheehan testified that he did not believe any of the actions he experienced were retaliatory at the time. In fact, he did not think so until he became involved in this lawsuit.

As such, Defendants' motion for summary judgment on Malone and Sheehan's conspiracy claims is granted.

### III.   Malone's Conspiracy Claims.

In addition to her retaliation claim, Intervenor-Plaintiff Malone also brings two claims based on conspiracy theories: (1) a claim under section 1985(2) and (2) a claim

of civil conspiracy under Illinois law. Defendants have moved for summary judgment as to both claims, and we address their challenges to each in turn.[3]

Section 1985(2) prohibits conspiracy by two or more persons "to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court or from testifying to any matter pending therein, freely, fully, and truthfully." 42 U.S.C. § 1985(2). Malone asserts that Defendants OSI, OSICS, along with Krueger and Char, who are not named Defendants in this case, conspired to deter Malone from testifying truthfully in the Quela litigation and conspired to obtain Malone's resignation from OSI. With regard to her claims of conspiracy as related to the Quela litigation, Malone asserts that Defendants conspired to pressure her into providing false witness statements and into falsely testifying at her deposition in that case. In her complaint, Malone does not make clear which of these parties specifically entered into such an alleged agreement. She instead generally alleges that some "combination" of them did so.

We first address Defendants' argument that Malone lacks standing to bring a claim under section 1985(2). There is a split of authority as to whether an individual

---

[3] We note that Malone urges us to apply the doctrine of collateral estoppel to Malone's conspiracy claims. She argues that the findings Judge Castillo made after holding an evidentiary hearing on the issues of witness tampering in the Quela litigation considered the identical issues of law and fact. We decline to apply collateral estoppel here. Judge Castillo did not consider whether Defendants participated in any type of conspiracy.

suing under section 1985(2) must have been a party to the litigation during which the conspiracy occurred. Some courts have held that a non-party witness may sue under this provision. See, e.g., Heffernan v. Hunter, 189 F.3d 405 (3rd Cir. 1999). Other courts have held that one who was not a party to the litigation during which the misconduct occurred cannot sue under section 1985(2). See Rylewicz v. Beaton Services, Ltd., 888 F.2d 1175 (7th Cir. 1989); David v. U.S., 820 F.2d 1038 (9th Cir. 1987); Jones v. Horn, 1998 WL 297636, at *3 (E.D. Pa. June 4, 1998); Hinchy v. City of Chicago, 1990 WL 17091, at *5 (N.D. Ill. Feb. 2, 1990). Bound by the Seventh Circuit's decision in Rylewicz v. Beaton Services, Ltd., we follow the latter cases. Accordingly, because Malone was a non-party witness in the Quela litigation, she does not have standing to sue under section 1985(2). Summary judgment is granted in favor of Defendants on that claim.

We next consider the arguments Defendants bring in support of their motion as to Malone's common law claim of civil conspiracy. We first address Defendants' contention that Malone cannot, as a matter of law, establish a conspiracy in this case because the alleged conspirators – OSI, Krueger, and Char – were all acting on behalf of OSI. This principle is known as the intracorporate conspiracy doctrine.

Illinois courts recognize the intracorporate conspiracy doctrine.[4] <u>Salayymeh v. InterQual, Inc.</u>, 508 N.E.2d 1155, 1158 (Ill. App. Ct. 1987); <u>Eisenhauer v. Stern</u>, No. 99 C 6422, 2000 WL 136011 at * 1 (N.D. Ill. Jan. 27, 2000) (citing <u>Buckner v. Atlantic Plant Maintenance, Inc.</u>, 694 N.E.2d 565, 571 (Ill.1998)); <u>Small v. Sussman</u>, 713 N.E.2d 1216, 1222 (Ill. App. 1 Dist.,1999); <u>Shrout v. McDonald's System, Inc.</u>, 234 N.E.2d 45 (1967). The idea behind this doctrine is that "the acts of an agent are considered in law to be the acts of the principal. Thus a conspiracy does not exist between a principal and an agent or servant." <u>Salaymeh</u>, 508 N.E.2d at 1158. Put another way, if the challenged conduct is essentially a single wrongful act by a single entity, the fact that two or more agents participated in the decision or the act itself will generally not constitute a conspiracy. <u>Dombrowski v. Dowling</u>, 459 F.2d 190, 196 (7th Cir. 1972). Application of the doctrine does not depend on whether the conspirators' actions were wrongful, but on whether the wrongful conduct was performed within the scope of the conspirators' official duties. <u>See, e.g.</u>, <u>Tabor v. City of Chicago</u>, 10 F. Supp. 2d 988, 994 (N.D. Ill. 1998).

---

[4] The Seventh Circuit has extended the intracorporate conspiracy doctrine to bar Section 1985(2) claims. <u>Wright v. Illinois Dep't of Children & Family Servs.</u>, 40 F.3d 1492, 1507-08 (7th Cir.1994); <u>Dickieson v. Der Travel Service, Inc.</u> 2000 WL 1051872, *1 (N.D. Ill., 2000). Defendants' arguments stemming from this doctrine, therefore, would have applied to Malone's section 1985(2) claim.

We find that the intracorporate conspiracy doctrine applies in this case. In obtaining Malone's written statements during OSI's internal investigation of the Quela plaintiffs claims of sexual harassment, both Krueger and Char were acting in their capacity as Malone's supervisors and, therefore, as OSI's agents. Accordingly, neither can be held to have conspired with their principal, OSI, or with one another when Char was working with OSI. See, e.g., Salaymeh, 508 N.E.2d at 1158. The doctrine also applies with regard to the procurement of Malone's false testimony and her resignation insofar as Malone claims Krueger conspired with OSI to accomplish these objectives.

Malone stresses that the doctrine should not apply to the procurement of the false written statements because it does not apply if an agent was acting outside the scope of employment. Jamaica Citizens Bank, Ltd. v. North Am. Special Risk Assoc., Inc., 1996 U.S. Dist. LEXIS 16321, at *14 (N.D. Ill. Nov. 1, 1996). While this is an accurate recitation of the law, Malone fails to convince us that she has any evidence creating a genuine issue of fact as to whether Krueger or Char or both of them were not acting within the scope of their employment. Malone claims that Char did so because he had a personal stake in the Quela litigation since he was one of the individuals alleged of engaging in sexually harassing behavior. We are not persuaded that this in itself means he was not acting as OSI's agent. Malone presents us with no legal theory by which Char was subjected to any liability.

Additionally, as explained above, the mere fact that the conduct alone may be wrongful does not take it beyond the scope of his employment. See, e.g., Tabor v. City of Chicago, 10 F. Supp.2d 988, 994 (N.D. Ill. 1998); Hayes v. Allstate Ins., Co., 95 F. Supp. 2d 832 (W.D. Tenn. 2000); see Restatement (Second) of Agency ¶¶ 230, 231 (1957). Nor does the fact that Char and OSI may have had a shared interest. Rather, the doctrine would not apply if there was sufficient evidence that Char acted *solely* for his own independent interests unrelated to OSI's interests. See, e.g., Hartman v. Board of Trustees of Community College District No. 508, 4 F.3d 465, 470 (7th Cir.1993); McCraven v. City of Chicago, 109 F. Supp. 2d 935, 946 (N.D. Ill. 2000); Zic v. Italian Government Travel Office 130 F. Supp. 2d 991, 997 (N.D. Ill. 2001); Bilut v. Northwestern Univ., 296 Ill. App. 3d 42, 49 (1998). Such a conclusion is not borne out by the record.

Although the intracorporate conspiracy doctrine applies to bar Malone's claims as they relate to any conspiracy between Defendants, Krueger, and/or Char in obtaining her written statements, and any conspiracy between Defendants and Krueger in obtaining her false testimony and her resignation, Buckner v. Atlantic Plant Maintenance, Inc., 694 N.E.2d 565, 571 (Ill. 1998), the doctrine does not present a complete bar to Malone's conspiracy claim. Malone contends that Defendants, via Krueger, conspired with Char to obtain her false deposition testimony and her

resignation. At the time of Malone's deposition and her resignation, Char was no longer employed by OSI. Once he left OSI's employment, he lost his status as the company's agent and must be considered an independent third party. The intracorporate conspiracy doctrine does not apply where, as under these circumstances, a corporation is alleged to have conspired with a third party. See, e.g., Zic v. Italian Government Travel Office 130 F. Supp. 2d at 997. We must therefore determine whether Malone's civil conspiracy makes it past summary judgment with regard to these two alleged conspiratorial objectives.

Defendants argue that Malone cannot survive summary judgment because she has not produced sufficient evidence of a conspiracy in that the record lacks any evidence of an agreement between two or more persons to convince Malone to testify falsely and to resign. An agreement is a required element of a claim of civil conspiracy under Illinois law. Midwest Media Advertising, Inc. v. Heritage Marketing, Inc., No. 92 C 1225, 1992 U.S. Dist LEXIS 6817, at *5 (N.D. Ill. May 19, 1992) (citing Bosak v. McDonough, 192 Ill. App. 3d 799, 549 N.E.2d 643, 646 (1st Dist. 1989)); Soros Associates, Inc v. Trafalgar House Constr. India Ltd., No. 98 C 1807, 1998 U.S. Dist LEXIS 9916, at *14-15 (N.D. Ill. June 26, 1998) (listing elements of civil conspiracy claim under Illinois law). The parties dispute the importance of an agreement in proving a conspiracy claim. Defendants emphasize that it is the central

ingredient to a conspiracy claim, while Malone attempts to minimize its significance almost to the point of arguing no evidence of an agreement is necessary at this stage of the litigation. The agreement is a "necessary and important" element of this cause of action, <u>Adcock v. Brakegate. Ltd.</u>, 164 Ill.2d 54, 62-64 (1994), and, contrary to Malone's contentions, the sufficiency of her allegations of an agreement may be challenged at this stage of the litigation. <u>See e.g.</u>, <u>Green v. Benden</u>, 281 F.3d 661, 665-66 (7th Cir. 2002) (granting summary judgment because plaintiff had no evidence showing alleged conspirators came to "meeting of the minds"). We therefore assess whether Malone has advanced any evidence supporting a reasonable conclusion that two or more persons agreed to pressure Malone into testifying falsely and into resigning from OSI.

Malone argues that such an agreement existed between Char and OSI via Krueger. Malone does not argue that any specific independent third party other than Char entered into such an agreement with Defendants. Defendants assert that there is no direct evidence of any such agreement between Krueger and Char. Malone does not dispute the non-existence of direct evidence of an agreement. Nor can she based on this record. Malone instead argues that an agreement may be inferred from circumstantial evidence. This is true, but only if the circumstantial evidence is "sufficient to permit a reasonable jury to conclude that a meeting of the minds had

occurred and that the parties had an understanding to achieve the conspiracy's objectives." Green, 281 F.3d at 665-66 (citations omitted); Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979).

Defendants argue that the record is devoid of sufficient circumstantial evidence creating a genuine issue of fact on the question of the existence of any agreement between OSI/Krueger and Char. We agree. The record lacks any evidence that Krueger and Char had any contact at all after Char left OSI's employment in August 1999. Green, 281 F.3d at 665-66 (granting summary judgment where no contact between alleged conspirators); Clausell v. Horne, Civ. No. 92-0623-AH-S, 1993 U.S. Dist. LEXIS 10119, at *14 (S.D. Ala. July 7, 1993) (stating an agreement presupposes communication). There is no evidence of any telephone calls, meetings, e-mail correspondence, or any other possible type of communication between the two after Char left OSI. Malone herself testified she has no knowledge of any contact between Krueger and Char. (Def.'s Facts ¶ 185). Furthermore, both Ausema Kiegelis (Krueger's long term roommate) and Char testified that there was no contact between Krueger and Char after August 1999 until Krueger's death.

Malone asks this court to assume that Char and Krueger must have had such an agreement simply because they both worked with her on her false written statements. This contention, without more, is inadequate to show an unlawful agreement regarding

- 46 -

Malone. This is particularly so given the great temporal distance between the time of her statements and her deposition. Malone also speculates that Krueger "must have" told Char when her deposition was, but she has no evidence supporting this other than her own opinion that Char could not have known any other way. She reveals the speculative nature of her argument when she writes that Char must have called her the night before her deposition pursuant to Krueger's "likely" instruction. (Malone's Resp. Brief at 12). Malone further attempts to support her claim by arguing that Krueger's role as the godmother of Char's two children is circumstantial evidence of their agreement, but this too is insufficient. Butscher v. Gubbins, 1994 WL 684954, at *6 (N.D. Ill. Dec. 6, 1994) (stating living together was not circumstantial evidence of conspiracy).

We find that the evidence presented by Malone as evidence of an agreement between Defendants and Char fails to create a genuine issue of fact on this necessary element of her civil conspiracy claim. Indeed, much of what she proffers is nothing more than her own unsupported speculation, and such speculation cannot create a genuine issue of material fact. Amadio v. Ford Motor Co., 238 F.3d 919, 927 (7th Cir. 2001); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 932 (7th Cir. 1995) (stating speculation only creates a false issue of fact). Accordingly, we grant Defendants' motion as to Malone's claim of civil conspiracy.

Because we have granted summary judgment on both of Malone's conspiracy claims for the reasons presented above, we do not address the other attacks Defendants lodge on these claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiff's claims of retaliation and constructive discharge is granted in part and denied in part. Plaintiffs may go forward only with their claim that Defendants retaliated against Shimanski when they passed her up for promotion in February 2000. Defendants' motion for summary as to Intervenor-Plaintiff Malone's conspiracy claims is granted.


Charles P. Kocoras
Chief Judge
United States District Court


Dated:  October 23, 2002